TAOS CONSTRUCTION COMPANY, INC.,
Plaintiff–Appellant/Cross–Respondent,

v.

PENZEL CONSTRUCTION COMPANY, INC.,
Defendant–Respondent/Cross–Appellant.

No. 53221.

Missouri Court of Appeals,
Eastern District,
Southern Division.

March 29, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 1988.

Application to Transfer Denied
June 14, 1988.

Mark W. Comley, Jefferson City, for Taos Const.

Stephen C. Wilson, Jackson, for Penzel Const.

John W. Koenig, Jr., Sikeston, for amicus curiae Missouri Highway & Comm.

REINHARD, Presiding Judge.

Both parties appeal from a judgment of the trial court in favor of defendant Penzel Construction Company on plaintiff Taos Construction Company's breach of contract claim and in favor of Taos on Penzel's counterclaim. The appeals are consolidated for our review; we affirm.

Penzel was the prime contractor for a Missouri Highway and Transportation Commission project that involved the construction of four bridges on Highway 106 in Shannon County for a total contract price of about $1.25 million. The contract allowed Penzel 120 working days in which to complete the project and contained a liquidated damages provision that permitted the Commission to deduct $200 from the amount due Penzel for every day the project remained uncompleted after expiration of the 120–working-day period.

The contract contained specifications for permanent soil erosion control. Taos, one of several subcontractors on the project, was responsible for fertilizing, seeding, and mulching approximately 12 acres of ground surrounding the construction sites for a total price of about $13,900. In the subcontract Taos agreed "to commence work

within 10 days following notification by Penzel," and acknowledged it had "thoroughly examined all contract documents as provided for this project, including the form of agreement between Penzel and [the Commission]," and that the contract and specifications agreed upon by Penzel and the Commission "are part of this subcontract and shall be made available for inspection by the Subcontractor upon his request." The subcontract contained the following liquidated damages clause:

The contract between Penzel and [the Commission] provides for liquidated damages. In the event Subcontractor has caused or contributed to cause in any way any part of any assessment of liquidated damages against Penzel, then in addition to all other remedies provided and available to Penzel, Subcontractor shall be liable to Penzel for the full amount of such penalty as shall be assessed by [the Commission] in the form of such liquidated damages plus 10% of said figure, together with reasonable attorney fees and costs, in the event it becomes necessary to use an attorney for purposes of collection, whether or not suit is brought. Penzel shall further have the right to withhold from any monies due Subcontractor hereunder all or a proportionate share of any liquidated damages assessed by [the Commission] against Penzel.

Operations on the project commenced July 11, 1983, and the 120–working-day period to complete the project expired August 15, 1984. On August 16, the Commission began assessing liquidated damages against Penzel at the daily rate of $200. Two of the four bridges were open to traffic by August 16; the remaining two were open to traffic about August 31. Prior to August 16, Taos had seeded the ground surrounding two of the bridges, an area comprising about five acres of the project. Penzel admits Taos did not cause any delays during this phase of its work and it did not cause Penzel to exceed the 120–day limit. Penzel's field superintendent stated

his opinion that delays during the 120–day contract period were caused primarily by the grading subcontractor and the weather.

Penzel notified Taos on August 24 to return to the job site to begin seeding the seven acres adjacent to the remaining two bridges. A Penzel engineer who was the project coordinator testified he informed Taos on August 24 that "the job was in liquidated damages...." The engineer said the 3½ acres around one of the two remaining bridges were ready for seeding on September 6; grading of the 3½ acre area around the other bridge was completed on September 18. He said the remaining seven acres could have been seeded in "four or five days ... that would be a reasonable time," and he stated that "it's not an uncommon practice for the seeder and the grading man to finish the same day or certainly within a day or so of one another." The Penzel field superintendent, who was at the job site daily, testified that all but one of the seven remaining acres could have been seeded before September 18; the final acre was a half-day job.

There was evidence in the form of the Commission's Weekly Report of Working Days, prepared by the Commission's resident engineer, about the number of working days available to Taos before September 21 to perform the seeding. According to the Weekly Report of Working Days, Taos did not begin seeding until October 4 and worked October 5 and November 7, 8, 9, 13, 14, 15, and 16. On those days, Taos applied 75 percent of the seed and fertilizer required to complete its work. On November 19, the Commission accepted the job subject to the remaining overseeding.[1] Taos performed the overseeding on December 4 and 13 and the Commission accepted the project unconditionally on December 13. The Weekly Report of Working Days indicated that, from the week ending September 27 until completion December 13, the major operation on the project was "seeding" and no work other than seeding was performed after September 21. The

---

1. According to the Penzel engineer, special rules apply to the application of seed and fertilizer in the fall. If seeding does not begin until October

1, only 75 percent of the seed and fertilizer may be applied; the remaining 25 percent is applied on or after December 1.

Commission's resident engineer continued to file the weekly report until the December 13 acceptance of the project.

The Commission assessed Penzel 71 days of liquidated damages for a total of $14,200. Penzel assessed the grading contractor for 25 days of damages, a total of $5,000, for the period August 16 through September 20. Penzel assigned to Taos all damage days after September 20, a total of 46, and withheld $9,200 from payment to Taos. There was evidence that Penzel suffered additional damages in excess of $900 as a result of Taos's tardy performance.

Taos filed a petition for a declaratory judgment against Penzel and the Commission in Cole County where the court dismissed the action against the Commission for lack of privity and then dismissed against Penzel for improper venue. Taos did not appeal the dismissal of the Commission. Taos then filed a first amended petition in Cape Girardeau County against Penzel alone seeking a declaratory judgment in Count I and asserting a breach of contract claim in Count II. Penzel brought a counterclaim for rental on a piece of its equipment that Taos used in performing the subcontract. Upon motion of Penzel, the court dismissed the declaratory judgment count because "the plaintiff has an adequate remedy at law, i.e., Count II."

Count II was tried without a jury. The court found that the 10–day notice provision in the subcontract referred to "working days" and that Taos should have resumed seeding on September 10. Among its other findings, the court found as follows:

8. After September 10, 1984, and before September 21, 1984, there were two separate bridge sites available for plaintiff to perform its work on, each consisting of approximately 3½ acres.

9. That the reasonable time necessary to seed, fertilize and mulch an area such as remained after September 10, 1984, would be between 4 and 5 days.

10. After September 10, 1984, the following working days were available during which plaintiff could have performed its seed and mulch work on the job site: September 12, 13, 14, 17, 18, 19 and 20.

11. The Court finds that plaintiff had more than a reasonable opportunity and amount of time to perform its work when the work site was ready and available to it.

The court concluded in its judgment that Penzel properly allotted 46 days of liquidated damages to Taos and did not breach the subcontract with Taos by withholding $9,200, that the provision for liquidated damages in the subcontract was not a penalty, and that "the State of Missouri and defendant suffered damage by reason of plaintiff's failure to perform its subcontract." Without elaboration, the court denied Penzel relief on its counterclaim.

On appeal, Taos contends the trial court's finding that the Commission and Penzel were damaged is not supported by substantial evidence, and it claims the liquidated damages provision in the subcontract is a penalty because the amount withheld by Penzel from Taos is disproportionate to (1) the injury sustained by Penzel, (2) the delay caused by Taos, and (3) the amount to be paid Taos under the contract.[2]

This court must sustain the decision of the trial court unless there is no substantial evidence to support its judgment, the judgment is against the weight of the evidence, or the judgment erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We defer to the trial court's determination of factual issues. *Cooper v. Allstate Insurance Co.*, 735 S.W.2d 204, 206 (Mo.App.1987).

■ Liquidated damages clauses are valid and enforceable; penalty clauses are not. *Grand Bissell Towers, Inc. v. Joan Gagnon Enterprises, Inc.*, 657 S.W.2d 378, 379 (Mo.App.1983). In *Grand Bissell Towers*, we noted that Missouri has adopted the rules of the Restatement of Contracts for determining whether a liquidated damages

---

2. Taos also alleges the trial court erred in dismissing Count I, the declaratory judgment count. The trial court, in its judgment on Count II, dealt with all the issues that Taos raised in Count I; we rule this point against Taos.

clause is, in fact, a penalty.[3] Concerning the Restatement formulation, we stated, "These rules requiring some reasonable relation between the damages agreed upon and those expected to result from the breach are not rules about actual damages" but we pointed out that Missouri courts have "consistently stated or held that the plaintiff must show at least some actual harm or damage caused by the breach before the liquidated damages clause can be triggered." *Grand Bissell Towers,* 657 S.W.2d at 379. In an explanatory footnote, we stated that although *proof* of actual loss is not a prerequisite to collecting liquidated damages, a *showing* of some actual harm or damage is necessary. "The showing of harm or damage necessary to trigger the liquidated damages clause need not be a precise dollar amount but simply a showing that some harm or damage did in fact occur." *Id.* at 379 n. 3.

■ In light of the foregoing, we consider Taos's claim that there was no substantial evidence of actual damage to the Commission and, therefore, no liquidated damages should have been assessed by the Commission against Penzel. We believe $200 a day was a reasonable forecast by the Commission and Penzel of the harm that might result from a delay in completion and that, at the time of execution of the contract, damages would have been difficult to estimate. Moreover, there was sufficient evidence to make "a showing that some harm or damage did in fact occur." *Grand Bissell Towers,* 657 S.W.2d at 379 n. 3. The Commission's resident engineer continued to file his Weekly Report of Working Days until completion of the project, even though "seeding" was the only activity that remained to be done after September 21 through December 13. Taos argues that because the "compelling concern of the entire contract was the time at which the bridges would be open to traffic and regular traffic flow could resume ... [t]he public could not experience any compensable damage because of a failure to reseed the slopes." We disagree with Taos's conclusion that the contract had so narrow a purpose. The Commission required Penzel, as prime contractor, to provide for soil erosion control on the project. The fact that the bridges were open to traffic did not bring the project to an end. *See Bethlehem Steel Corp. v. City of Chicago,* 234 F.Supp. 726 (N.D.Ill.1964), *aff'd,* 350 F.2d 649 (7th Cir.1965).

■ Although we believe the liquidated damages clause was properly invoked under the Restatement standard, there is another reason we believe the assessment of liquidated damages by the Commission against Penzel was correct. The case before us involves a public works project, not a private owner. The southern district in *Sides Construction Co. v. City of Scott City,* 581 S.W.2d 443 (Mo.App.1979), a case involving a contract to build a swimming pool, bathhouse, and related items in a city park, expressed its view that, in a public works project, the public entity may recover liquidated damages solely upon proof of a violation of the contract. *Id.* at 447.

The view expressed in *Sides Construction* has support in other state court opinions. *See, e.g., Melwood Construction Corp. v. State,* 126 Misc.2d 156, 481 N.Y. S.2d 289, 292–93 (1984) and cases cited therein, *aff'd* 119 A.D.2d 734, 501 N.Y.S.2d 604 (1986); *Dave Gustafson & Co. v. State,* 83 S.D. 160, 156 N.W.2d 185, 188–89 (1968). There also are federal court opinions sup-

---

**3.** Restatement of Contracts § 339 (1932) provides in pertinent part:

(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless
(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

In a footnote in *Grand Bissell Towers,* we quoted from Restatement (Second) of Contracts § 356 (1979), which provides in part:

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

porting this view. *See, e.g., United States v. Bethlehem Steel Co.*, 205 U.S. 105, 119, 27 S.Ct. 450, 455, 51 L.Ed. 731, 737 (1907); *Bethlehem Steel Corp.*, 234 F.Supp. at 729–32; *Southwest Engineering Co. v. United States*, 341 F.2d 998, 1001–02 (8th Cir.1965).[4]

■ Concerning Taos's claim that there was no substantial evidence to support the finding that Penzel was damaged, we believe there is no question Penzel suffered actual harm; it was assessed $14,200 in liquidated damages by the Commission, and it suffered additional damages in excess of $900.

■ Taos also contends the liquidated damages clause in the subcontract is a penalty clause. Under the Restatement formulation, we believe $200 a day was a reasonable forecast of just compensation. The fact that the monetary damage to Penzel was a function of liquidated damages assessed by the Commission and Taos's share was, therefore, easy to calculate does not make the clause a penalty clause. Taos agreed that it would be liable to Penzel for liquidated damages it caused or to which it contributed. Moreover, this is not a liquidated damages case involving a challenge to liquidated damages assessed by an owner to a prime contractor. It is proper for a prime contractor to "pass on" to a subcontractor liquidated damages caused by the subcontractor. *See Holloway & Son Construction Co. v. Mattingly Bridge Co.*, 481 S.W.2d 568, 572 (Ky.1972).

■ Taos urges us to take a hindsight approach and conclude the amount withheld by Penzel was disproportionate to various factors. Although the Restatement speaks in terms of a "reasonable forecast of just compensation," actual damages are relevant to a determination of reasonableness. *Grand Bissell Towers*, 657 S.W.2d at 379. Viewing Taos's claims from this perspective, we conclude the amount assessed to Taos cannot be said to be disproportionate to Penzel's actual harm of more than $14,000. There also is no merit in Taos's argument that the $9,200 is disproportionate to the delay it caused. There was evidence that Taos, aware the project was in a liquidated damages phase, could have finished the job before September 21, and that seeding was the only activity remaining after that date. All liquidated damages through September 20 were assessed by Penzel to the grading subcontractor; delay beyond that point was properly assigned to Taos. Taos cites no authority for the proposition that, because the liquidated damages assessed to it constitute almost 66 percent of the amount of the subcontract, the clause is actually a penalty clause. Taos looks to the wrong benchmark; any "disproportion" must be measured against the amount of harm, not the dollar amount of the subcontract. The judgment in favor of Penzel on Taos's claim should be affirmed.

At oral argument, Penzel virtually abandons its counterclaim for rent, admitting that it originally did not intend to charge Taos for the use of the equipment. The record supports the trial court on this point, and we affirm this portion of the judgment without opinion. Rule 84.16(b).

Judgment affirmed.

CRIST, J., and SIMEONE, Senior Judge, concur.

---

**4.** We recognize our case of *Corrigan Company Mechanical Contractors, Inc. v. Fleischer*, 423 S.W.2d 209 (Mo.App.1967), which involved an income-producing public housing project, could be read as requiring a showing of actual harm to the owner in a public works contract and not just a violation of the contract. We believe *Sides Construction* states the better approach to a liquidated damages clause in a public works contract; moreover, even under the stricter *Grand Bissell Towers* approach, we believe there was a showing of actual damage to the Commission.